[743 NYS2d 439]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MARC WEIN, Respondent.

First Department, June 6, 2002

APPEARANCES OF COUNSEL

*Andrew C. Hruska* of counsel (*Alan Gadlin* on the brief; *Robert M. Morgenthau, District Attorney,* New York County, attorney), for appellant.

*Barry Levin* for respondent.

## OPINION OF THE COURT

MARLOW, J.

Over the People's objections, this counseled defendant entered into a plea and sentencing agreement with the court whereby he pleaded guilty to an entire 113-count indictment charging grand larceny and related crimes. In exchange for this plea, the court promised defendant a total prison sentence of 1 to 3 years, and that he would be ordered to pay his victims approximately 80% of their losses, on the condition they waive their right to separately sue defendant in a civil forum for any unpaid balance. Furthermore, and also over the District Attorney's protests, the court directed that all restitution payments be made to, and distributed by, a court-appointed "special master" to whom defendant was ordered to pay a fee of $10,000 instead of a mandatory 5% surcharge. Finally, the Justice fined defendant $10,000.

On this People's appeal, we face the question whether, as the People maintain, we can modify the judgment to excise ancillary, but clearly illegal portions of a plea agreement, and otherwise affirm defendant's sentence; or whether, as defendant contends, he is entitled to either specific performance of the plea agreement or vacatur of the plea and a return to his preplea status. We modify the sentence to excise only its illegal portions, and otherwise affirm.

## The Indictment

A New York County grand jury filed an indictment on July 25, 2000 accusing defendant, a New York stockbroker, of a total of 113 counts, including grand larceny in the second and third degrees; forgery in the second degree; criminal possession of a forged instrument in the second degree; scheme to defraud in the first degree; falsifying business records in the first degree; and securities fraud under General Business Law § 352-c (5) and (6).

The first 112 counts were based on defendant's sale to his customers of $4.4 million in unregistered preferred stock in Millennium Services Corporation, a company which repre-

sented it owned or had under contract a large number of funeral homes. Defendant received a commission of $440,000 for selling the securities. Because most of defendant's clients were not qualified under federal securities laws to buy Millennium's unregistered stock, defendant forged their investor suitability forms. Millennium apparently owned no funeral homes and dissipated the funds by self-dealing transactions with an investment company owned by defendant's close friend and by other related entities. Dividends were also paid to the earliest investors in what turned out to be a "Ponzi scheme."

The indictment's 113th count alleged that defendant defrauded his brokerage-account clients when, without their authorization, he traded and margined their accounts in order to increase his commissions, and, when, in order to benefit himself, he failed to follow his clients' specific instructions to sell certain securities.

On March 22, 2001, the assigned Trial Justice was apparently concerned that a lengthy trial resulting in high legal fees would dissipate defendant's assets and would tie up the court and jurors for months. At a conference the next day, the court described the trial as a "monster" and discussed the ways he intended to limit the People's proof, saying "the idea that the People can drag [defendant] through months of an expensive trial and running up huge amounts of money is grossly unfair." The court stated a "full[ ] inten[tion] to circumscribe [the prosecutor's] ability to beat the hell out of [defendant]."

## The Plea Negotiations and Agreement

On March 26, defense counsel raised the prospect of a guilty plea and argued for a prison term of no more than 1 to 3 years and restitution of $1 million. The People recommended 3 to 9 years and full restitution. During the discussion, defense counsel said that, as a condition of the payment of restitution by defendant, he wanted releases from all the victims and from the Securities and Exchange Commission, which had commenced a civil enforcement action against defendant.

The following day, defendant offered to plead guilty and pay $2 million in restitution in exchange for a one-year sentence. However, the People explained that a one-year sentence is illegal, citing this Court's decision in *People v Furman* (280 AD2d 385). The Justice acknowledged his familiarity with that case, but nevertheless stated the sentence in *Furman* "clearly was within the parameters, but *** outside the technicalities," and "made a gre[a]t deal of sense, except to the Appellate Division."

In any event, the court was unwilling to impose 3 to 9 years or 2 to 6 years with full restitution.

Plea negotiations continued, essentially between the defense and the court. Because the Justice believed some victims had received distributions, he declined to direct defendant to make full restitution. Defendant pressed for general releases from the victims as a condition of receiving any restitution, but the prosecutor did not believe the law allows a court to require such releases. The court acknowledged it could not require victims to sign releases, but determined that it had the power "to set up funds which says, if you want it, this is the price * * * they don't have to take [it]."

Until this point, the restitution discussions had been based on losses incurred by those who had invested in Millennium, and the People raised the issue of restitution for the defrauded brokerage account victims (count 113 of the indictment). Although the People presented proof that defendant's actions caused this latter group of victims to lose approximately $437,000, the court decided it would fine defendant $10,000 on this last count instead of allowing restitution as part of the plea agreement.

On March 28, 2001, the court and defense counsel discussed the mechanics of the proposed releases at length, and the court concluded the restitution money earmarked for any investor unwilling to sign a release would be returned to defendant. The prosecutor vehemently objected and read Penal Law § 60.27 (6) into the record, which provides: "Any payment made as restitution or reparation pursuant to this section shall not limit, preclude or impair any liability for damages in any civil action or proceeding for an amount in excess of such payment."

The prosecutor again emphasized that requiring victims to sign releases in exchange for restitution violates this statute. The court then asked defense counsel if the defense would take the risk that the releases would be invalid under the Penal Law. Counsel responded that he would "take that risk."

In order to ensure that restitution would be conditioned on victims executing general releases, the court decided to retain control over the funds by appointing a special master to administer them. The People further objected, citing CPL 420.10 (8), which requires that restitution be paid through an agency designated by the New York City Mayor, and Penal Law § 60.27 (8), which mandates that a defendant pay a 5% surcharge to the designated agency. However, the Justice rejected these clear legislative edicts, characterizing the

government as "worse than a bookie" that charges a "vig." He then decided that defendant could plead conditionally with a promised sentence of 1 to 3 years, disregarding the People's request that, before the Justice determined what sentence he would impose, he hear and *consider* the defrauded victims' statements. When defendant raised concerns the sentence might be overturned on appeal based on the restitution procedure, the court again referred to *People v Furman (supra)*, disclosing that, on remand, the court resentenced Furman to time served. He added that trying to overturn this defendant's sentence "probably doesn't lead to [a] much different result."

On April 2, 2001, defendant pleaded guilty to the entire indictment, thus obviating the need for the prosecution to consent to any aspect of the promised sentence (*see*, CPL 220.10 [2]). The People again objected (1) to the limitation the court imposed on the victims' right to pursue a later civil remedy were they first to choose to seek restitution in the criminal proceeding, and (2) to the appointment of a special master, noting also that the statute calls for a mandatory surcharge to be imposed on restitution. The court again criticized the mandatory 5% surcharge and insisted on making the appointment. Thereafter, the People submitted a presentence memorandum urging anew the illegality of the plea agreement.

On April 18, 2001, the court set restitution in the amount of $2,399,579.27. The Justice also announced his intention to appoint his friend, an attorney, as special master to administer the restitution fund, adding that he expected his friend's fees to be only 15% to 20% of what a designated agency would assess. The People again objected to the proposed restitution scheme, and the court admonished the prosecutor about the delays the People would occasion should they throw a "monkey wrench" into the procedure by taking an appeal.

### The Sentence

The court imposed the promised sentence on July 18, 2001. Several victims interposed presentence impact statements, expressing the hardship defendant's crimes inflicted on them and their families, and requesting full restitution and/or a longer prison sentence. The People argued that the prison term of 1 to 3 years is inadequate and once again pointed out that the restitution proviso of the plea agreement is illegal.

Nevertheless, the court sentenced defendant to 113 concurrent terms of 1 to 3 years and ordered defendant to pay restitution of $2,399,579.27, $10,000 to cover the special master's

fees, and a $10,000 fine, payable to the State, for the crimes alleged in the last count of the indictment. After the People filed a notice of appeal, the court directed the special master to take no further action until this appeal is decided.

## The Parties' Contentions

On appeal, the People argue that the court's restitution arrangement, which requires victims to surrender all their civil claims against defendant, is a flagrant violation of Penal Law § 60.27 (6). That section provides that receipt of restitution does not limit a defendant's liability for damages in a civil proceeding. They also contend that the scheme violates CPL 420.10 (8), which requires that an agency, formally designated by New York City's Mayor, administer the distribution of the restitution funds. Therefore, the People seek to have the release provision stricken from the sentencing order, the restitution funds transferred to a designated agency, and an order requiring defendant to pay the mandatory 5% surcharge instead of the $10,000 "fee" for the special master.

The People also argue that defendant is not entitled to specific performance of his sentence because it is illegal. They further maintain that defendant is not entitled to have his sentence vacated because the court imposed the release requirement at his own urging, with his assurance that it was an "every day" occurrence, and that he would "take the risk" if the release were invalidated. The People also note that, after the defense filed their appellate brief, defendant moved before the sentencing court to modify his sentence or, in the alternative, vacate his conviction. Defendant now complains—as the People originally had correctly stated at plea and sentence—that the release provision in the plea agreement is illegal.

Now asserting that the court acted improperly, defendant contends that the restitution provisions of Penal Law § 60.27 (6) do not apply because the sums the Justice directed him to pay are not restitution. Rather, he says they are a civil penalty, governed by Penal Law § 60.30, which the court, in its discretion, may impose and administer. He further contends that, in any event, the court had discretion under section 60.27 (6) to require civil releases because the victims are free to forego the receipt of restitution within the criminal case and instead pursue their ordinary civil remedies. Additionally, he asserts that the funds being administered are settlement funds, not strictly restitution, and thus the appointment of a special master was proper. Finally, he advances that he is entitled to

specific performance of the promised sentence or, if the People now prevail, to have this Court vacate his entire plea and sentence and return him to his preplea status.

## Discussion

When a plea agreement is consummated, it is not inconceivable that a court or a district attorney will make a sentence promise to a defendant which the law will not permit. If, in the absence of defendant's fraud, the court or district attorney begets the error, ordinarily justice calls for a remedy that either restores defendant to his preplea status, or, if defendant cannot be so restored, enforces the agreement (*People v McConnell,* 49 NY2d 340, 346; *People v Frederick,* 45 NY2d 520, 524).

Today, we are presented with a somewhat different and most unusual scenario in which both defendant and the court, over the prosecutor's vigorous objections, actively participated in creating a trio of illegal sentence provisions and linking them to the plea agreement. The record is clear that defendant convinced the court that, by means of defendant's guilty plea to the entire indictment, defendant and the court could bypass an otherwise mandated consent of the prosecutor to the contested, and concededly illegal, portion of their sentencing agreement, and thus succeed in effectuating their unlawful plan. After securing minimal prison time, which the prosecutor was powerless to prevent, defendant then pressed the court to deprive victims, who were manifestly not parties to this illegal agreement, of their separate and independent right to pursue, in the civil arena, the balance of the claimed restitution. The Justice, over the prosecutor's repeated objections, agreed to the illicit provisions after defense counsel assured him that defendant was willing to take the risk that the releases might be ruled invalid on appeal. The Justice, on his own, then completed the triad of unauthorized terms by ignoring, again over the prosecutor's objections, the plain language of the Criminal Procedure and Penal Laws and choosing his attorney/friend to administer the restitution fund for a $10,000 fee, and, finally, by dispensing with the *mandatory* surcharge.

Responding to the People's appeal to this Court to excise the illegal portions of his agreement, defendant now asks us to undo the very arrangement he engineered, accepted, pleaded for, and sponsored with his legal eyes wide open. In so asking, defendant would have us shield him from exposure to enhanced financial consequences he *might* subsequently face in a civil forum. He makes this plea with the same force as though he

were facing increased criminal penalties, e.g., longer imprisonment, greater fines, or stricter probation.

We reject defendant's request. We hold instead that, under these narrow circumstances, neither enforcing the plea agreement nor vacating the guilty plea would be an appropriate way to cure the purely pecuniary illegalities of a sentence, created by defendant's own maneuvering, persistence, and design. By simply excising the flawed sentence terms, our holding is all the more apt, because defendant will merely be exposed to subsequent, *potential* civil liability—limited only to the extent of the losses his admitted wrongs occasioned.

## I. The Illegality of the Plea Agreement

Contrary to defendant's contentions, the plea and sentence agreement contains three seriously flawed provisions. To begin with, the court conditioned the victims' right to receive restitution on their execution of releases. This violated Penal Law § 60.27 (1), a statute that unequivocally and unconditionally entitles a crime victim to receive restitution, within the context of a criminal matter, if the court orders it. Furthermore, Penal Law § 60.27 (6) secures a victim's independent, parallel right also to pursue a defendant civilly should there be a deficiency in the restitution amount.[1] Plainly, the court cannot, as part of the criminal disposition, simply evade such a clear statutory mandate by forcing defendant's victims to agree to surrender their specifically protected civil remedies in order to receive an amount less than the entire restitution justly due.

Indeed, in *Cowles v Brownell* (73 NY2d 382), a case presenting a converse issue, the *plaintiff* had agreed to surrender his right to sue a municipality for false arrest in exchange for the prosecution's offer to dismiss a criminal charge. The Court of Appeals declared that agreement unenforceable, explaining (*id.* at 386-387):

> "Insofar as the integrity of the criminal justice system was concerned—the paramount interest here—on this record there was no benefit, only a loss. Assuming plaintiff to have been guilty of the

---

1. Defendant contends that the court imposed restitution under Penal Law § 60.30. However, this statutes merely preserves the law-conferred authority of a court to impose civil penalties. In no way is restitution a civil penalty. Penal Law § 60.27 (6) provides in relevant part: "Any payment made as restitution or reparation pursuant to this section shall not limit, preclude or impair any liability for damages in any civil action or proceeding for an amount in excess of such payment."

criminal charges leveled against him (as the prosecutor maintains) the People's interest in seeing a wrongdoer punished has not been vindicated. Assuming him to have been innocent (as he maintains), or the case against him to have been unprovable, the prosecutor was under an ethical obligation to drop the charges without exacting any price for doing so. In either case, as in a case where the prosecutor simply determines that charges are not worth pursuing, such an agreement leaves unanswered questions about defendant's conduct in making the arrest and about the motives of the District Attorney's office. There is no public interest to be advanced by enforcing the agreement here. Rather, the agreement may be viewed as undermining the legitimate interests of the criminal justice system solely to protect against the possibility of civil liability; it surely does not foster public confidence that the justice system operates evenhandedly."

Although the Court of Appeals did not deem coercion to be a central issue, it noted (*supra* at 386): "the danger of coercion presented by [such a] choice," one which the Appellate Division's majority and concurring opinions also mentioned in *Cowles v Brownell* (127 AD2d 325, 328, 329; *see also, Dziuma v Korvettes*, 61 AD2d 677, 679).

In light of the Court of Appeals' refusal to enforce a waiver against an accused criminal defendant in *Cowles*, it would now be inconsistent, at best, to enforce this civil waiver exacted from *crime victims* in order to protect a *convicted* defendant from the potential of a future civil suit aimed at making his partially compensated victims whole. After all, these victims' civil remedies are protected by statute, and, beyond that, they were in no way a part of the agreement made only between the Justice and defendant.

In *People v Grune* (278 AD2d 668), another case presenting an analogous converse question, the Court issued a ruling like that urged by the prosecution here. The Court said (at 668-669):

"There is arguable merit to defendant's contention that the People exceeded their authority in requiring him to waive his right to seek civil damages in exchange for a diminished jail sentence. It does not necessarily follow, however, that his waiver of ap-

peal or judgment of conviction should be vacated as a result. *To the contrary, the appropriate remedy for the impermissible extraction of a criminal defendant's release of a civil claim is to deny enforcement of the release when and if it is asserted by way of defense in a civil action*" (emphasis added).

Moreover, these victims can hardly be held bound by an agreement to which they were not a party, nor would they be collaterally estopped by such an agreement formed without their participation, without notice to them, and without any opportunity to be heard and to litigate the amount of reparations due them as a result of defendant's wrongs (*see, Ryan v New York Tel. Co.*, 62 NY2d 494, 500-501; *Schwartz v Public Adm'r of County of Bronx*, 24 NY2d 65, 70-71; *Weinstein Enters. v Morini*, 217 AD2d 615, 616; *Farber v Stockton*, 131 Misc 2d 470, 471).

The court further violated the applicable sections of the Criminal Procedure and Penal Laws when it appointed its attorney/friend as special master, instead of appointing a designated New York City official or organization, to collect and administer the restitution fund. Criminal Procedure Law § 420.10 (8) (a) provides that, within the City of New York, the Mayor "shall designate an official or organization * * * to be responsible for the collection and administration of restitution * * *." The Mayor has so designated an agency known as Safe Horizons to carry out this function, and the sentencing court was without authority to override this statute.

Finally, Penal Law § 60.27 (8) requires a 5% mandatory surcharge on the entire restitution amount, which the sentencing court also refused to impose.[2]

This record permits no doubt that this plea and sentence agreement between only the Justice and the defense was designed to circumvent clear legislative mandates governing restitution in criminal cases. As the Court of Appeals held in *People v Lopez* (28 NY2d 148, 152), "[s]urely a Judge, a prosecutor and a defendant cannot by agreement restructure substantive law to fit their notion of what is more appropriate in a particular case."

---

**2.** The sentencing court also, in violation of statute, directed that any restitution moneys unclaimed by the victims eventually be returned to defendant; that defendant pay an unauthorized $10,000 "fee" to the special master; and that the special master's usual and customary legal fees be paid from this $10,000 "fee" and from any interest income or dividends earned in the deposited restitution fund (*see*, CPL 420.10 [7]).

Here, the matter is even more egregious because the agreement was not made by and between the court and *both* sides. Instead, it was only between the defense and the court, with the prosecutor at no time acquiescing, but, rather, at every opportunity, explicitly objecting to its illegality. Plainly, the sentencing court had no authority to impose the challenged provisions of the sentence or to refuse to impose the mandatory surcharge (Penal Law § 60.27 [8]).

The People simply seek to modify the judgment to the extent of excising the three illegal provisions, a position with which this Court agrees.

## II. Defendant Is Not Entitled to Specific Performance

Defendant further contends that he is entitled either to specific performance of the plea agreement or, alternatively, to be returned to his preplea status.

Both federal and state law provide that where an unfulfilled sentence promise by the state or the court has induced a defendant to enter a guilty plea, the promise must be honored or the plea vacated (*see, Santobello v New York*, 404 US 257; *People v McConnell*, 49 NY2d 340, 346; *People v Selikoff*, 35 NY2d 227, 241, *cert denied* 419 US 1122). The choice is within the sentencing court's sound discretion (*see, People v McConnell, supra* at 346; *People v Selikoff, supra* at 239).

A court will grant specific performance in cases where the defendant cannot be restored to the status quo ante due to his detrimental reliance on promises made by the court or the prosecution (*see, People v McConnell, supra* at 345-349 [defendant entitled to specific performance of sentencing promise because he not only waived right to trial and privilege against self-incrimination, but testified before grand jury resulting in indictment of three codefendants and testified before petit jury against one codefendant and was instrumental in pleas of guilty by other codefendants]).

However, since a defendant cannot rely as a matter of law on a promise that cannot be legally performed, a defendant cannot seek to enforce a promise that a prosecutor had no authority to make (*see, People v Selikoff, supra*, 35 NY2d at 241 [where prosecutor stated on record that he would recommend no jail time and stated off the record, without authority, that, if jail time were imposed, he would not oppose a motion to withdraw the plea, defendant not entitled to withdraw plea]; *compare, Matter of Chaipis v State Liq. Auth.*, 44 NY2d 57, 66 [relied-upon promise, not made in violation of the law, but

made outside an agency's authority, could be enforced if another agency is authorized to fulfill it]).

The record before us reveals that neither the court nor the prosecutor made any illegal promises *upon which defendant relied to his detriment*. Rather, the record reflects that defendant actively pursued, indeed insisted on an illegal component of a plea agreement—one which he knew is illegal—for the sole purpose of minimizing his civil exposure, over the People's adamant objections. In addition, defendant stood by and acquiesced, by his silence, when the court added its own additional illegal provisions to the plea agreement, again over the People's repeated, well articulated, and plainly valid objections. We will not specifically enforce this agreement whose major unlawful provision is one which defendant championed, and where he then stood idly by, fully aware that the secondary provisions, added by the court, were equally invalid. The criminal justice system ought not to be used to fashion illegally designed benefits for undeserving defendants at the sole expense of his or her already aggrieved victims.

### III. Defendant Is Not Entitled to Vacatur of his Guilty Plea

Alternatively, defendant argues that he is entitled to be returned to his preplea status in the absence of specific performance. Although a court may return a defendant to his preplea status where a sentencing flaw comes to light *after* the plea is entered (*see, People v Ruiz*, 226 AD2d 747, *lv denied* 88 NY2d 969), the court need not necessarily vacate the plea. Generally, the plea will stand when a defendant has knowingly permitted the court and prosecution to operate under a misconception of the facts, even if defendant consequently suffers a longer jail sentence (*see, People v Da Forno*, 73 AD2d 893, *affd* 53 NY2d 1006 [court refused to vacate plea where defendant withheld status as a predicate felon, and sentence promise was based on defendant's misrepresentation, but actual sentence imposed was greater based on predicate felony status]; *see also, People v Wright*, 270 AD2d 213, *lv denied* 95 NY2d 859 [court properly denied defendant's motion to vacate guilty plea where sentencing error occurred as a result of defendant's attempt to perpetrate a fraud on the court by using an alias and denying prior criminal record]; *People v Floyd*, 177 AD2d 310, *lv denied* 79 NY2d 947 [defendant, who misrepresented his age to court, would not be allowed to benefit from fraud]).

Here, over the prosecutor's repeated protests, defendant actively joined the court in negotiating a plea agreement which

all parties knew is not authorized—knowledge they harbored well in advance of the actual plea and sentence.

Moreover, we find it also important that, here, no liberty interest whatsoever of defendant is at stake, because the defective sentencing provisions involve only his victims' rights in a potential, independent civil lawsuit and the statutorily mandated structure for administering restitution and its accompanying surcharge. If the law refuses to give a defendant his plea back when his fraud has occasioned greater jail time, a fortiori, justice discerns no reason to return this defendant to his preplea status. Indeed, he can hardly complain of being deprived of such a benefit where his self created, additional *potential* exposure is merely pecuniary and not penal.

Our holding today also honors New York State's longstanding history of allowing and encouraging criminal courts to order, to the extent possible, reparations to be paid by convicted offenders to their victims. This policy is deeply rooted in the common law. It saw seventeenth-century English courts first order restitution in contract cases, and then later saw that procedure "migrate[ ] to courts in the United States, and it has since expanded beyond its original contractual roots" to criminal and other areas of the law (9 West's Encyclopedia of American Law, Restitution, at 19 [1998]). Notwithstanding that this well-settled policy has become inextricably interwoven into the fabric of our criminal justice system, the sentencing court deviated from this practice, originally adopted in New York by statute in 1910, and which has been routine in the criminal courts of New York ever since.

Restitution's first statutory appearance in 1910 gave judges this sentencing option only for defendants placed on probation, as a simple and direct measure to compensate crime victims (*see*, 4th Ann Report of NY St Probation Commn for the year ending Dec. 31, 1910, at 34).[3] The original statute provided that a defendant may be ordered, as a probation condition, to "make reparation or restitution to the aggrieved parties for actual damages or losses caused by his offense" (former Code Crim Pro § 11-a [4] [k] [L 1910, ch 610]). This authority was carried forward via section 932 of the former Code of Criminal Procedure (L 1928, ch 460), also as part of a sentence of proba-

---

3. We note, parenthetically, the effectiveness of the then newly formalized state policy for the benefit of crime victims. As indicated in the report, "[i]n 1909 the amount collected [statewide] by probation officers in restitution and reparation was $1,770.45, while in 1910 the amount collected was [tripled to] $5,490.44." (*Id.*)

tion; and once again under section 65.10 (2) (f) of the Penal Law (currently § 65.10 [2] [g]), which became effective September 1, 1967 (L 1965, ch 1030). More recently, the Legislature broadened the court's authority by permitting restitution to be combined with a sentence of imprisonment (Penal Law § 60.27 [former (1)] [L 1980, ch 290, § 1]), and, ultimately, by *requiring* the court to *consider* adding a restitution component to a sentence of incarceration whenever it is requested and appropriate (Penal Law § 60.27 [1] [L 1983, ch 397, § 2]).[4]

## Conclusion

Defendant cannot have it both ways. He cannot, on the one hand, pursue an agreement which, in pertinent part, utterly violates the law while, on the other, request a return to his preplea status where the sentencing court is unable to fulfill the illicit elements of that agreement. This holding takes on even greater force in the context of a purely pecuniary risk defendant willingly and expressly took from the start of a process he aggressively instigated.

We thus conclude that where a counseled defendant actively pursued, openly risked, and clearly ignored the illicit pecuniary aspects of a plea agreement he voluntarily entered, and where the court actively participated in brokering that agreement—infected as it was with the three illegal provisions—and, further, where the People vigorously objected to these patently unlawful components, defendant is neither entitled to specific performance nor to a return to his preplea status (*see, McConnell, supra* at 346).

Accordingly, the judgment of the Supreme Court, New York County (Lewis Stone, J.), rendered July 18, 2001, convicting defendant, on his plea of guilty, of 113 counts of grand larceny in the second degree and related crimes, and sentencing him to 113 concurrent terms of 1 to 3 years and to pay restitution, should be modified, on the law, to the extent of deleting from the court's sentencing order the provision requiring that the

---

4. This subdivision, in pertinent part, provides: "In addition to any of the dispositions authorized by this article, the court shall consider restitution or reparation to the victim of the crime and may require restitution or reparation as part of the sentence imposed upon a person convicted of an offense * * * The court shall hear and consider the information presented by the district attorney in this regard. In that event, or when the victim impact statement reports that the victim seeks restitution or reparation, the court shall require, unless the interests of justice dictate otherwise, * * * that the defendant make restitution * * * for the actual out-of-pocket loss caused * * * to the victim."

victims sign releases discharging defendant from civil liability; deleting the provisions appointing a "special master" and that excess restitution funds and interest be returned to defendant, and substituting therefor a provision directing that an official agency designated by the Mayor of the City of New York receive and disburse said funds; and deleting the provision that defendant pay the "special master" a $10,000 fee, and substituting therefor a provision that defendant pay the 5% mandatory surcharge; and otherwise affirmed.

WILLIAMS, P.J., TOM, ROSENBERGER and WALLACH, JJ., concur.

Judgment, Supreme Court, New York County, rendered July 18, 2001, modified, on the law, to the extent of deleting from the court's sentencing order the provision requiring that the victims sign releases discharging defendant from civil liability; deleting the provisions appointing a "special master" and requiring that excess restitution funds and interest be returned to defendant, and substituting therefor a provision directing that an official agency designated by the Mayor of the City of New York receive and disburse said funds; and deleting the provision that defendant pay the "special master" a $10,000 fee, and substituting therefor a provision that defendant pay the 5% mandatory surcharge; and otherwise affirmed.